## UNITED STATES v. ONE FORD COUPÉ, PA. LICENSE 831-H-5.

### No. 1484.

District Court, D. Delaware.

Nov. 3, 1937.

John J. Morris, Jr., U. S. Atty., of Wilmington, Del.

Stewart Lynch (of Biggs & Lynch), of Wilmington, Del., for claimant Universal Credit Co.

NIELDS, District Judge.

Claim of Universal Credit Company for remission of forfeiture of a Ford coupé.

September 11, 1935, Gash-Stull Company, a dealer in Ford cars at Chester, Pa., sold under an installment contract a Ford coupé, No. 18–2143800, to a man giving the name of Joseph Delmare (hereinafter called "buyer") for $599. Buyer made a down payment of $231 leaving an unpaid balance of $368. This balance plus carrying charges of $52 made a deferred balance of· $420 "which lessee promises to pay at the office of Universal Credit Company, in 12 installments of $35.00 each."

September 12, 1935, Gash-Stull Company submitted this installment contract for sale to Universal Credit Company and thereupon Universal Credit Company purchased the interest of Gash-Stull Company in the contract. Under an arrangement between Gash-Stull Company and Universal Credit Company the latter company was given 20 days within which to investigate the risk. If the risk proved undesirable Universal Credit Company could surrender the contract and receive back the money paid. Universal Credit Company direct-·ed Dunn · & Bradstreet, Inc., the well-known credit agency, to make an investigation concerning one Joseph Delmare, 1222 West Third street, Chester, Pa., the name and address given by the buyer. An investigator of that company visited Chester and·made a report. Significant passages from the report are as follows:

a. At the top of the report are the words, "The following report is furnished * * * for your exclusive use as an aid in determining the advisability of granting credit or insurance, and for no other purpose."

b. To the question "is he a desirable credit risk?" the answer is "In doubt." The reasons assigned for the answer are "Financial responsibility is pratically ·nil, and employment is irregular."

c. Under the head of "Home Life" are the words "This is a poor, working-class section inhabited principally by those of foreign extraction. The entire neighborhood does not bear a favorable reputation."

d. Under the head "Financial" are the words "From his employment, he manages to derive about $20 to $25 weekly, but practically all his earnings are absorbed by living expenses."

Under cross-examination the investigator testified:

"XQ. Did you ever see Delmare? A. I never did.

"XQ. Did not interview him? A. No.

"XQ. At the time you went to the address where you said that you found out where he lived, did you inquire for him? A. No. We are not allowed to do that.

"XQ. You are not allowed to inquire for the man? A. No.

"XQ. And never interviewed him? A. No.

"XQ. Why not? A. That is a certain restriction on the reporting agency. A majority of the subscribers that do deal with us make that a very rigid rule, not to interview, unless they specify that, then we will.

"XQ. But that was not specified? A. That is right."

Thereafter beginning October 23, 1935, six monthly payments of $35 each were made to Universal Credit Company.

May 2, 1936, Delaware Liquor Commission seized the Ford coupé in Delaware and delivered it to agents of the Internal Revenue as forfeited to the United States, under section 3450, U.S.R.S. (26 U.S.C.A. § 1441). The coupé was used "in the removal and for the deposit and concealment of * * * ten 5-gallon cans of alcohol, in respect whereof a tax is imposed, with intent to defraud the United States of the said tax." Thereafter two men named Fisher and Napolski were tried and convicted in this court for violation of the revenue laws.

July 11, 1936, a libel of forfeiture for breach of section 3450, U.S.R.S., was filed against the Ford coupé. The libel prayed that process of the court issue against the coupé. Thereupon the court ordered that the car be attached by the marshal and that all interested parties intervene for the protection of their interests.

September 4, 1936, Universal Credit Company intervened and made claim to said automobile under the provisions of the Act of August 27, 1935, § 204 (section 40a, title 27 U.S.C.A.). On said date it was stipulated by the parties that the appraised value of the coupé was $400. September 8, 1936, the court ordered the coupé delivered to claimant upon its giving bond as required by law. Bond was furnished and the coupé was delivered to Universal Credit Company.

The claim in this case is based upon provisions of the Act of August 27, 1935, § 204, 49 Stat. 878 (27 U.S.C.A. § 40a), which provides:

Sec. 204. "(a) Whenever, in any proceeding in court for the forfeiture, under the internal-revenue laws, of any vehicle or aircraft seized for a violation of the internal-revenue laws relating to liquors, such forfeiture is decreed, the court shall have exclusive jurisdiction to remit or mitigate the forfeiture.

"(b) In any such proceeding the court shall not allow the claim of any claimant for remission or mitigation unless and until he proves (1) that he has an interest in such vehicle or aircraft, as owner or otherwise, which he acquired in good faith, (2) that he had at no time any knowledge or reason to believe that it was being or would be used in the violation of laws of the United States or of any State relating to liquor, and (3) if it appears that the interest asserted by the claimant arises out of or is in any way subject to any contract or agreement under which any person having a record or reputation for violating laws of the United States or of any State relating to liquor has a right with respect to such vehicle or aircraft, that, before such claimant acquired his interest, or such other person acquired his right under such contract or agreement, whichever occurred later, the claimant, his officer or agent, was informed in answer to his inquiry, at the headquarters of the sheriff, chief of police, principal Federal internal-revenue officer engaged in the enforcement of the liquor laws, or other principal local or Federal law-enforcement officer of the locality in which such other person acquired his right under such contract or agreement, of the locality in which such other person then resided, and of each locality in which the claimant has made any other inquiry as to the character or financial standing of such other person, that such other person had no such record or reputation."

At the hearing on the bill before the Committee on the Judiciary of the United States Senate, August 15, 1935, a representative of the Treasury Department testifying before the committee as to the purpose of this section said:

"What this section will do, in the case of any court proceeding for the forfeiture

of vehicles or aircraft, is to give the court jurisdiction to determine whether or not the person claiming to have an innocent interest actually had such interest. Under the present practice the Secretary of the Treasury requires such a showing. * * * This section is of particular importance in connection with the discounting by a finance company of an automobile dealer's paper.

"At the present time, the Secretary of the Treasury considers that the bootleg hazard is an element involved in the credit risk, and is just as much a part of the investigation by the finance company of a person as a credit risk as is his financial standing in the community. He requires that before a car be returned to the person claiming an innocent interest, the latter must prove that he made an investigation as to whether or not the purchaser had a bootlegger record, and found that he had none."

If the investigator of Dunn & Bradstreet, Inc., had visited 1222 West Third street, Chester, the address given by the buyer, he would have found a bootlegger. The address of the buyer was the home of a bootlegger and his family. A reasonable investigation by the Universal Credit Company would have disclosed the fact. An investigator for the Federal Alcohol Tax Unit testified:

"Q. * * * Did you go to 1222 West Third Street, in Chester, during your investigation? A. I did.

"Q. And who did you find lived there? A. A man by the name of Ed. Committe.

"Q. Ed. Committe? A. That is right.

"Q. Did you find out how long Ed. Committe had lived there? A. He had lived there over a period of seven years with his family.

"Q. Did you find out whether or not a man by the name of Joseph Delmare had ever lived there?

"Mr. Lynch: I object to the form of that question, sir.

"By the Court:

"Q. Well, was this the domicile of a single family or might it have been inhabited by two? A. It was inhabited by the family of Committe and no others."

Under cross-examination Katharine McLaughlin testified:

"X. How long have you known Committe, Mrs. McLaughlin? A. About six years.

"X. And in what respect? How did you come to know him? A. Through the bootlegging business.

"X. Was he ever convicted of bootlegging? A. I don't know.

"X. But he was a bootlegger? A. Yes, sir.

"X. All the time that you knew him? A. Yes."

It is established by the testimony of numerous witnesses that Committe was a bootlegger and it is nowhere contradicted. Throughout the record it was repeatedly suggested by the government that Joseph Delmare was a fictitious name used by the buyer. In fact he was not produced as a witness although three hearings were held, the first on February 2, 1937, and the last on May 21, 1937. There is a striking analogy between this case and United States v. One Ford Coach Automobile (D.C.) 20 F.Supp. 44, 47, where the court says:

"This is the simple case of a bootlegger buying an automobile for use in his illegal business and causing the title to be placed in the name of an acquiescent straw man who, in fact, had nothing to do with the control, custody, or use of the car. It is a device of increasingly frequent use by bootleggers. Conceding that the petitioner acquired its interest in good faith and without knowledge or reason to believe that the car would be illegally used, its position is not one to appeal to the sympathetic consideration of the court. For it must be said that it was able to remain in that favored state of ignorance only because it refrained from seeking knowledge. * * *

"To grant remission of forfeiture in cases of this sort would be to strip the government of its most effective weapon against the handling of illicit liquor. The possibilities of evasion and fraud in such cases are evident and are almost without limits."

 I agree with this court's holding that the right of remission or mitigation of forfeiture under the Act of August 27, 1935, rests in the sound discretion of the court in view of all the evidence. The Universal Credit Company relied wholly upon the report of Dunn & Bradstreet, Inc., which dealt almost exclusively with the financial standing of the buyer. No

investigation of the bootlegger risk was made. From all the evidence in the case it is clear that Universal Credit Company cannot claim an innocent interest in the Ford coupé. So holding, the forfeiture should not be remitted, and the prayer of the petition should be denied.